# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF OKLAHOMA

RICHARD TACKETT,     )
            )
       Plaintiff, )
            )
v.             )
            )  Case No. 6:20-cv-113-JAR
KENDALL MORGAN and    )
LEFLORE COUNTY SHERIFF,  )
            )
       Defendants. )

### OPINION AND ORDER

Before the Court is the motion for summary judgment [Doc. 121][1] filed on behalf of defendant Leflore County Sheriff in his official capacity, pursuant to Fed. R. Civ. P. 56(a). Plaintiff Richard Tackett brings this action pursuant to 42 U.S.C. § 1983 against the LeFlore County Sheriff and former LeFlore County Undersheriff, defendant Kendall Morgan ("Morgan" or "Undersheriff Morgan"), based on allegations that Morgan violated his rights under the Fourth and Fourteenth Amendments to the United States Constitution through the use of excessive force during an arrest by local law enforcement in Spiro, Oklahoma on April 23, 2018.

## I. SUMMARY JUDGMENT STANDARD

Pursuant to Fed. R. Civ. P. 56(a), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Summary judgment is appropriate only "if the pleadings, depositions, answers to interrogatories, and admission on filed,

---

[1] For clarity and consistency herein, when the Court cites to the record, it uses the pagination and document numbers assigned by CM/ECF.

together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Id. (*quoting* Fed. R. Civ. P. 56(c)). A fact is "material" if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party." Id. "Factual disputes that are irrelevant or unnecessary will not be counted." Id. The non-moving party "must do more than simply show that there is some metaphysical doubt as to the material facts." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986). "Inferences supported by conjecture or speculation will not defeat a motion for summary judgment." Self v. Crum, 439 F.3d 1227, 1236 (10th Cir. 2006). However, "at the summary judgment stage the judge's function is not [] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249. At this stage, the Court "view[s] the evidence and the reasonable inferences to be drawn from the evidence in the light most favorable to the non-moving party." Schaffer v. Salt Lake City Corp., 814 F.3d 1151, 1155 (10th Cir. 2016) (citation omitted).

## II.    UNDISPUTED MATERIAL FACTS [2]

Mr. Tackett was at his residence in Spiro, LeFlore County, Oklahoma on April 23, 2018, when a friend of his son arrived with a wallet he found on a nearby road. [Doc. 127-2 at 2-3 (61:19-62:6), 4 (64:12-23)]. Mr. Tackett promptly contacted the

---

[2] Unless otherwise noted, the following facts are undisputed for summary judgment purposes.

wallet's owner, Shawna Hale, by way of Facebook Messenger. He attached to the message a picture of Ms. Hale's driver's license, advised where and when her wallet had been found, and offered to leave the wallet in a blue mailbox on Cannery Road for her retrieval. [Doc. 127-3]. Ms. Hale, who happened to be married to an officer with the Panama Police Department, replied: "Omg thank you so much!!" [*Id*. at 3].

Later that same day, Mr. Tackett was awakened from a nap by pounding on his front door. [Doc. 127-2 at 11-12 (74:22-75:3)]. He stepped outside to find several uniformed officers from the LeFlore County Sheriff's Office ("LCSO"), the Spiro Police Department, and the Panama Police Department inquiring about Ms. Hale's wallet. [*Id*. at 11-13 (74:1-76:13); Doc. 127-1 at 5]. After Mr. Tackett handed over the wallet, one officer accused him of removing cash from the same. [*Id*. at 13 (76:11-16)]. Mr. Tackett denied the accusation but, due to an outstanding warrant for an unpaid traffic ticket, was handcuffed and placed in a patrol car belonging to Spiro Officer Theo Capes. [*Id*. at 19-21 (82:16-84:13); Doc. 127-1 at 5; Doc. 127-4 at 11 (41:6-13)].

Undersheriff Morgan arrived shortly thereafter. [Doc. 127-5 at 12-14 (95:19-97:23)]. As Officer Capes assisted other officers on the scene [Doc. 121-2 at 2 (41:6-13)], Morgan joined Mr. Tackett in the backseat of Capes' vehicle to obtain permission for a home search. [Doc. 127-2 at 23 (90:1-22)]. Upon Mr. Tackett's refusal to consent, Morgan accused him of being "a thieving piece of sh*t" before placing both hands around Mr. Tackett's neck and choking him into unconsciousness. [*Id*. at 23-24 (90:17-91:3); Doc. 121-1 at 22-23 (86:22-87:13)]. Mr. Tackett further testified that after regaining consciousness, Morgan inquired into the location of "the f***ing money"

before again choking him into unconsciousness. [*Id*. at 22 (88:3-15), 24-25 (91:18-92:4)]. Officer Capes concurrently "heard a lot of noise coming from [his] backseat" and approached the squad car. [Doc. 121-1 at 2 (41:14-20)]. He observed a deputy standing outside his vehicle and heard Morgan yelling in the backseat. [*Id*.]. He then heard "a loud gargling / choking sound." [Doc. 127-1 at 5].[3] Moments later, Morgan wordlessly exited Officer Capes' vehicle. [*Id*.].

According to Mr. Tackett, he regained consciousness to Capes "fanning" him. [Doc. 127-2 at 25 (92:1-17)]. Mr. Tackett exclaimed, "Hey, man, I'm in your custody. You're responsible for my safety. You just gonna let that sumb**ch choke me until I'm f***ing dead?" [*Id*. (92:20-25); Doc. 121-1 at 3 (42:16-20) ("Mr. Tackett [] told me that Kendall [Morgan] had grabbed him by the throat and was squeezing his throat.")]. Officer Capes subsequently provided Spiro Police Chief Michael Draper with details of the incident. [Doc. 127-1 at 5; Doc. 127-4 at 13-14 (44:13-45:7); Doc. 127-13 at 12-15 (24:3-27:14)]. In response, Chief Draper informed Capes that Spiro officers would be required to activate their body cameras during the course of all future dispatches. [Doc. 127-13 at 14-15 (26:3-27:14)].

## A.  LCSO POLICIES AND PROCEDURES

At all times relevant to this action, LCSO maintained a policy allowing officers to use non-deadly force in certain situations [Doc. 121-9 ("Non-Deadly Force Policy")]; a policy prohibiting officers from using more force than reasonably necessary [Doc. 121-10 ("Use of Force Policy")]; a policy prohibiting the mistreatment of persons in

---

[3] Officer Capes later described this sound as "a grunt-type noise" and testified that it "sound[ed] like possibly something physical had taken place." [Doc. 127-4 at 12 (43:1-6), 18 (63:9-15)].

custody [Doc. 121-11 ("Treatment of Persons in Custody Policy")]; and a policy requiring deputies to report infractions of the rules and regulations by other officers [Doc. 121-12 ("Reporting Infractions Policy")]. In addition, all LCSO officers were required to obtain and maintain a Council on Law Enforcement Education and Training ("CLEET") certification, to obtain the requisite continuing law enforcement related education, and to maintain knowledge of all LCSO policies and procedures.

### B.    RELEVANT ALLEGED EVENTS OCCURRING PRIOR TO APRIL 23, 2018

It is undisputed that Rob Seale served as the Sheriff of LeFlore County from 2013 until his resignation in late-December of 2019.

#### 1.    Chad Osterhout | June 27, 2015

On March 20, 2017, Chad Osterhout filed a civil rights lawsuit alleging excessive and unnecessary use of force by Undersheriff Morgan. [Doc. 121-4, ¶ 5]. *See* Osterhout v. Morgan, 763 Fed. Appx. 757 (10th Cir. 2019). Mr. Osterhout specifically alleged that, on June 27, 2015, Morgan kneed him several times in the ribs after repeatedly striking him with a flashlight and/or a closed fist, resulting in a broken nose, facial lacerations, and a shattered orbital socket. *See* id. at 759-60; *see also* Osterhout v. Bd. of Cty. Comm'rs of LeFlore Cty., 10 F.4th 978, 997-99 (10th Cir. 2021).[4] Sheriff Seale was present at the hospital on the night of this incident and was "fully aware" of Mr. Osterhout's injuries, as well as their origin. [Doc. 127-5 at 7-8

---

[4] The Tenth Circuit upheld a jury's finding that Morgan used excessive force against Mr. Osterhout. Id., at 982-83 ("According to Mr. Morgan, Mr. Osterhout was trying to flee; Mr. Osterhout says that he remained still with his hands raised.. . . The jury attributed liability to Mr. Morgan and the Board, awarding Mr. Osterhout $3 million in compensatory damages" and "$1 million in punitive damages").

(53:2-54:20), 36 (210:6-9); Doc. 127-6 at 2 (477:4-25)]. During a deposition on January 26, 2018, Morgan admitted to falsely stating in his incident report that he observed Mr. Osterhout's "clinched fist" during their encounter. [Doc. 127-9 at 7-8 (91:5-92:3)]. Morgan further admitted to hitting Mr. Osterhout in the face with a closed fist [*Id.* at 2 (80:11-16), 3-4 (81:24-82:7), 9 (93:13-25)], to using enough force to break Mr. Osterhout's nose and knock him to the ground [*Id.* at 9 (93:13-25)], and to violating LCSO policy by failing to document Mr. Osterhout's injuries and their source [*Id.* at 5-6 (89:9-90:4), 10-11 (142:12-143:18)].

### 2.    Byron Sakobie | December 11, 2015

On December 11, 2015, Chief Draper witnessed Undersheriff Morgan strike an arrestee, Byron Sakobie, at least three times in the face with a closed fist. [Doc. 127-1 at 6; Doc. 127-13 at 2-11 (13:18-22:7)]. Mr. Sakobie was handcuffed at the time, sitting in the backseat of a Spiro patrol car. [Doc. 127-13 at 2-11 (13:18-22:7)].

### 3.    Andrew Pohl | April 11, 2016

On or about April 11, 2016, Andrew Pohl was detained at his residence in Spiro, LeFlore County, Oklahoma. [Doc. 127-1 at 2]. As Mr. Pohl stood on the front porch with hands cuffed behind his back, he and Undersheriff Morgan began yelling at one another. [Doc. 127-14 at 2-5 (33:6-37:21)]. Spiro Officer Andrew Bevil turned toward the commotion and witnessed Morgan head-butt a handcuffed Mr. Pohl in the face. [*Id.*; Doc. 127-1 at 2]. Mr. Pohl's nose immediately began bleeding, and he believed it to be broken. [Doc. 127-1 at 2]. Officer Bevil then witnessed LCSO Deputy

Terry Winn throw Mr. Pohl to the ground while he was still handcuffed. [Doc. 127-14 at 6 (37:12-16)].

### 4.    Doyle Potter | January 27, 2017

On or about January 27, 2017, Doyle Potter was arrested at a residence located near Spiro, LeFlore County, Oklahoma. [Doc. 127-1 at 2]. As a handcuffed Mr. Potter was voluntarily answering questions, Undersheriff Morgan head-butted him in the face at least five times. [*Id*.]. Mr. Potter believed his nose was broken as a result. [*Id*.] As part of a plea agreement, Morgan later admitted that "while employed as a law enforcement officer of the [LCSO], and while acting under color of law, [he] willfully assaulted" Mr. Potter "by repeatedly striking" him while he was "in handcuffs and not resisting arrest." [Doc. 127-15 at 2].[5] Morgan further conceded that "[t]he assault did not further any legitimate law enforcement purpose." [*Id*.; Doc. 127-5 at 2-6 (16:21-20:12)].

### 5.    John Patrick McKenzie | March 10, 2017

On or about March 10, 2017, John Patrick McKenzie was arrested at a residence near Spiro, LeFlore County, Oklahoma. Mr. Tackett puts forth evidence of the ensuing incident in the form of body camera footage from the Spiro Police Department. [Doc. 127-16 (Filed Conventionally); Doc. 127-17 (Filed Conventionally)]. Undersheriff Morgan does not dispute that he appears in the body

---

[5] A federal grand jury indictment was filed in the Eastern District of Oklahoma on December 9, 2021, charging Morgan with three counts of deprivation of rights under color of law in violation of 18 U.S.C. § 242. *See* United States v. Morgan, 6:21-cr-381-RAW. In addition to excessive force allegations involving Mr. Potter, the indictment accused Morgan of: (i) using excessive force against C.R., a handcuffed and non-resisting juvenile, during an arrest on December 13, 2017; and (ii) using excessive force against A.S., a handcuffed and non-resisting adult, during an arrest on January 25, 2017. *See* id. [Doc. 2 (Sealed Indictment, *unsealed by Minute Order at Doc. 8*)].

camera footage [Doc. 127-5 at 15-28 (117:23-130:9)], and has identified other LCSO officers on the scene as Tyler Underwood and Terry Winn. [*Id.* at 25 (127:7-12)].

To start, the body camera footage shows Morgan forcibly taking Mr. McKenzie to the floor while Mr. McKenzie was holding a one-year-old child. [Doc. 127-16 at 25:15-26:00]. After leveling multiple blows and deploying pepper spray, Morgan pushed a handcuffed Mr. McKenzie down the front porch steps. [*Id.* at 28:11-46; Doc. 127-13 at 16 (31:3-8) ("[T]he one thing that I didn't agree with was when the suspect was handcuffed and he was shoved off the porch.")]. With a visibly swelling and bloodied face, Mr. McKenzie was finally placed in the backseat of a patrol car. [Doc. 127-16 at 29:13, 29:31]. Thereafter, the body camera footage captures an amused Morgan stating, "I'll kill that motherf***er next time." [Doc. 127-17 at 00:14-20]. "I know," Deputy Winn replied. [*Id.*]. Morgan then jumped into the passenger seat of the patrol car containing Mr. McKenzie and yelled, "I've already killed one motherf***er; I should have killed you, b**ch. You motherf***er." [*Id.* at 0:46-1:00]. Spiro Officer Jaclyn Emmert, whose body camera recorded the footage obtained by Mr. Tackett, can then be heard radioing for EMS. [*Id.* at 1:16-2:25].

### 6. Joseph Woodard | July 26, 2017

On or about July 26, 2017, Joseph Woodard was arrested at a residence in Poteau, LeFlore County, Oklahoma. [Doc. 127-1 at 2]. After placing a handcuffed Mr. Woodard in the backseat of a patrol car, Undersheriff Morgan used his open hand to "palm strike" Woodard at least twice in the face. [*Id.*]. Mr. Woodard believed the second blow broke his nose. [*Id.*]. This incident was witnessed by another law

enforcement officer who was formally interviewed by the Oklahoma State Bureau of Investigation ("OSBI") and provided a detailed statement regarding Mr. Woodard's arrest. [*Id.*].

### 7. Jacob Rogers | December 5, 2017

On February 26, 2019, Jacob Rogers filed a civil rights lawsuit in the Eastern District of Oklahoma based on allegations that LSCO officers Fernando Cardenas and Michael Wiles unlawfully entered his home and assaulted him on December 5, 2017. [Doc. 121-14 at 5]. *See* <u>Rogers v. State of Oklahoma et al</u>, 6:19-cv-69-RAW.

### 8. John Albert | December 27, 2017

On or about December 27, 2017, John Albert was arrested near Poteau, LeFlore County, Oklahoma. [Doc. 127-1 at 3]. While Mr. Albert was handcuffed, Undersheriff Morgan head-butted him in the face. [*Id.*]. Mr. Albert believed his nose was broken as a result. [*Id.*]. This incident was witnessed by LCSO Deputy Cody Edwards who was formally interviewed by OSBI and corroborated the narrative provided by Mr. Albert. [*Id.*]. Deputy C. Edwards further testified in a deposition that, after Morgan head-butted Mr. Albert, he threw Mr. Albert through a barbed wire fence. [Doc. 127-19 at 3 (23:1-19)]. Lieutenant Donnie Edwards witnessed Mr. Albert's injuries after he was brought to the jail. [Doc. 127-8 at 7-8 (60:24-61:19)]. Sheriff Seale was also present when Mr. Albert was booked. [*Id.*; Doc. 127-20].

### 9. Sarah Nicole Robinson | January 9, 2018

On December 9, 2021, Sarah Nicole Robinson filed a civil rights lawsuit in the Eastern District of Oklahoma based on allegations that Undersheriff Morgan struck

her in the face on January 9, 2018, while she was handcuffed. [Doc. 121-14 at 4]. *See* Robinson v. Morgan et al, 6:19-cv-410-SPS.

### C. UNDERSHERIFF MORGAN'S RESIGNATION FROM LCSO

On July 26, 2018, Undersheriff Morgan responded to a dispatch call involving the arrest of a suspected bank robber. [Doc. 121-8]. After Morgan arrived on the scene, officers from other agencies noticed he appeared intoxicated. [*Id*.]. Sheriff Seale encountered Morgan outside the Spiro Police Department later that day and noted a strong odor of burnt marijuana on his person. [*Id*.]. Sheriff Seale confronted Morgan with these observations the following day and demanded he take a drug test. [*Id*.]. Morgan responded that he could not pass a drug test due to recent and consistent consumption of marijuana, unidentified pills, and alcohol. [*Id*.]. Sheriff Seale accordingly demanded his resignation, which Morgan immediately tendered. [*Id*.; Doc. 121-7]. One year later, or on July 31, 2019, Sheriff Seale requested investigative assistance from OSBI in reference to multiple alleged instances of excessive force used by Morgan. [Doc. 127-1 at 2; Doc. 121-8].

### D. RELEVANT PROCEDURAL HISTORY

Mr. Tackett initiated this action on April 20, 2020, asserting (i) a § 1983 individual liability claim against Undersheriff Morgan based on allegations that Morgan violated his rights under the Fourth and Fourteenth Amendments by using excessive and objectively unreasonable force, and (ii) a § 1983 municipal liability claim against the acting Sheriff of LeFlore County (the "Sheriff") in his official capacity premised upon three theories of liability – a custom at LCSO of allowing

excessive use of force by officers, a failure to train in the excessive use of force, and a failure to supervise LCSO officers in their use of force.

The Sheriff moved for summary judgment on August 2, 2024, arguing that Mr. Tackett cannot prevail on his municipal liability claim because: (1) there is no evidence that the alleged policy, practice, or custom of LCSO existed and directly caused the alleged injury; (2) Mr. Tackett cannot demonstrate a specific deficiency in the training of Undersheriff Morgan which was obvious and closely related to the alleged constitutional violations; and (3) there is no evidence of any affirmative causal link between the alleged violations and any failure on the part of former Sheriff Seale to supervise Undersheriff Morgan.

## III.  ANALYSIS | MUNICIPAL LIABILITY CLAIM

A municipality or other local governmental body, though a "person" for purposes of § 1983, "may not be held liable under § 1983 solely because it employs a tortfeasor." Bd. of Cty. Comm'rs of Bryan Cty. v. Brown ("Brown"), 520 U.S. 397, 403 (1997).[6] Rather, "it is when execution of a government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury that the government as an entity is responsible under § 1983." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 694 (1978). "A plaintiff suing a municipality under section 1983 for the acts of one of its employees must prove: (1)

---

[6] Suing an individual defendant, such as the Sheriff, in his official capacity is essentially another way of pleading an action against the county or municipality he represents. See Kentucky v. Graham, 473 U.S. 159, 165-66 (1985); see also Martinez v. Beggs, 563 F.3d 1082, 1091 (10th Cir. 2009) ("To the extent [plaintiff] brings a claim against [the sheriff] in his official capacity, it is the same as bringing a suit against the county.").

that a municipal employee committed a constitutional violation, and (2) that a municipal policy or custom was the moving force behind the constitutional deprivation." Myers v. Okla. Cty. Bd. of Cty. Comm'rs, 151 F.3d 1313, 1316 (10th Cir. 1998) (*citing* Monell, 436 U.S. at 684).

The first element is not at issue, as the Sheriff proffers no argument regarding the "underlying constitutional violation" requirement. Turning to the second element, the Sheriff contends the municipal liability claim must fail because Mr. Tackett has not shown that any policy, practice, or procedure of LCSO was the moving force behind the alleged violations. *See* Mocek v. City of Albuquerque, 813 F.3d 912, 933 (10th Cir. 2015) ("[A] plaintiff asserting a § 1983 claim must show '1) the existence of a municipal policy or custom and 2) a direct causal link between the policy or custom and the injury alleged.' Through 'its *deliberate* conduct,' the municipality must have been the 'moving force' behind the injury.") (emphasis in original) (*quoting* Brown, 520 U.S. at 404).

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to these policymakers' review and approval"; and (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

Bryson v. City of Okla. City, 627 F.3d 784, 788 (10th Cir. 2010) (alterations in original) (*quoting* Brammer-Hoelter v. Twin Peaks Charter Acad., 602 F.3d 1175, 1189-90 (10th Cir. 2010)). In this case, only the second and fifth forms are at issue.

Mr. Tackett's theories of municipal liability – informal custom or usage, failure to train, and failure to supervise – will be separately considered by the Court.

### A. INFORMAL CUSTOM OR USAGE

Mr. Tackett claims the Sheriff's liability arises from an informal custom of excessive use of force, in violation of LCSO's own written policies. *See* Lankford v. City of Hobart, 73 F.3d 283, 286 (10th Cir. 1996) ("If the violation cannot be characterized as official policy, then [the municipal defendant] can still be held liable if the practice is 'so permanent and well settled as to constitute a custom or usage with the force of law.'") (*quoting* Adickes v. S.H. Kress & Co., 398 U.S. 144, 168 (1970)). In order to establish municipal liability on the basis of a custom, the challenged conduct must be a "persistent and widespread" practice at LCSO. *See* Monell, 436 U.S. at 691. "In attempting to prove the existence of such a continuing, persistent and widespread custom, plaintiffs most commonly offer evidence suggesting that similarly situated individuals were mistreated by the municipality in a similar way." Carney v. City & Cty. of Denver, 534 F.3d 1269, 1274 (10th Cir. 2008). Although the Tenth Circuit has never adopted a bright-line rule as to the number of similar incidents required to establish the existence of a custom, most courts, including the Tenth Circuit, have concluded that a single incident – or even three incidents – do not suffice.[7]

---

[7] *See* Williams v. City of Tulsa, 627 Fed. Appx. 700, 704 (10th Cir. 2015); Wilson v. Cook Cty., 742 F.3d 775, 780 (7th Cir. 2014) ("Although this court has not adopted any bright-line rules for establishing what constitutes a widespread custom or practice, it is clear that a single incident – or even three incidents – do not suffice."); Andrews v. Fowler, 98 F.3d 1069, 1076 (8th Cir. 1996) (two instances of misconduct were insufficient to indicate a "persistent and widespread" pattern of misconduct).

### 1.    Persistent and Widespread Practice

The summary judgment record contains evidence of at least ten instances of excessive force used by Undersheriff Morgan against subdued and/or non-threatening citizens between June 2015 and January 2018. Moreover, Morgan himself testified that the body camera footage of Mr. McKenzie's arrest reflected how LCSO officers consistently conducted themselves on other arrests where officers were later accused of using excessive force. [Doc. 127-5 at 26 (128:1-20)]. This sworn statement is further supported by the following evidence: (i) body camera footage showing LCSO officers Underwood and Winn made no objection to Morgan shoving the handcuffed and bloodied Mr. McKenzie down porch steps; (ii) eyewitness testimony confirming that Deputy Winn threw a handcuffed Mr. Pohl to the ground after Morgan head-butted Mr. Pohl in the face; (iii) Morgan's deposition testimony identifying two specific instances of unnecessary force used by LCSO officers C. Edwards and D. Edwards [Doc. 127-5 at 29-32 (171:2-174:14), 37-38 (211:16-212:7)]; and (iv) Mr. Rogers' civil rights lawsuit alleging excessive use of force by LCSO officers Wiles and Cardenas in December of 2017.

The Court finds that the summary judgment record sufficiently identifies over a dozen instances of unreasonable force used by LSCO officers between December 2015 and January 2018, of which can reasonably be construed to establish the necessary "persistent and widespread" practice requirement. The Court further finds the identified instances of unreasonable force used by Morgan to be sufficiently similar to the constitutional violations alleged in this case – *i.e.*, a physical assault

against a handcuffed and/or non-threatening citizen. Accordingly, Mr. Tackett has sufficiently alleged a departmental custom of excessive force used by Morgan and other LCSO officers.

### 2. Direct Causal Link

Mr. Tackett must next show a direct causal link between the established custom and his alleged injury. To "establish the causation element, the challenged policy or practice must be 'closely related to the violation of the plaintiff's federally protected right.'" Schneider v. City of Grand Junction Police Dep't, 717 F.3d 760, 770 (10th Cir. 2013). "This requirement is satisfied if the plaintiff shows that 'the municipality was the "moving force" behind the injury alleged.'" Id. (*quoting* Brown, 520 U.S. at 403-04). The requirement to show this direct causal link is "stringent," and courts must "carefully test the link between the policymakers' inadequate decision and the particular injury alleged." Brown, 520 U.S. at 410, 415.

Mr. Tackett argues that former Sheriff Seale's failure to enforce LCSO's written policies, particularly the Use of Force Policy, predictably resulted in the alleged constitutional violations by Undersheriff Morgan. As noted, at all times relevant to Mr. Tackett's claims in the case, LCSO had a Use of Force Policy prohibiting officers from using more force in any situation than reasonably necessary under the circumstances [Doc. 121-10], as well as a policy prohibiting the mistreatment of persons in custody and requiring such persons to be handled in accordance with the law and LCSO's policies and procedures [Doc. 121-11]. Any reasonable factfinder could infer that an officer violates these policies when he

15

physically assaults handcuffed and non-threatening arrestees and detainees. While the summary judgment evidence suggests that Undersheriff Morgan physically assaulted at least ten handcuffed and non-threatening citizens between June 2015 and January 2018, there is no indication in the record that any of these incidents resulted in an investigation, let alone disciplinary action, during Sheriff Seale's tenure. Based on the foregoing, the Court finds that Mr. Tackett has sufficiently demonstrated a causal link between Sheriff Seale's non-enforcement of LCSO policies, particularly the Use of Force Policy, and Morgan's alleged use of excessive force against Mr. Tackett.

### 3.  Deliberate Indifference

"The deliberate indifference standard may be satisfied when the municipality has actual or constructive notice that its action or failure to act is substantially certain to result in a constitutional violation, and it consciously or deliberately chooses to disregard the risk of harm.  In most instances, notice can be established by proving the existence of pattern of tortious conduct. In a narrow range of circumstances, however, deliberate indifference may be found absent a pattern of unconstitutional behavior of a violation of federal rights is a highly predictable or plainly obvious consequence of a municipality's action or inaction[.]"

Barney v. Pulsipher, 143 F.3d 1299, 1307 (10th Cir. 1998). Here, Mr. Tackett asserts there is ample evidence of Sheriff Seale's "actual knowledge" of Morgan's pattern of excessive force. The record indeed suggests that, prior to April 23, 2018, Sheriff Seale was aware of (i) the circumstances giving rise to the excessive force lawsuit filed by Mr. Osterhout against Morgan in March of 2017; (ii) the circumstances giving rise to Mr. Albert's injuries in December of 2017; and (iii) the fact that, during a deposition

in January 2018, Morgan admitted to falsely stating in his incident report that Mr. Osterhout threatened him with a closed fist.

The Sheriff nevertheless contends there is no evidence that Sheriff Seale possessed actual knowledge of any persistent pattern of excessive force used by Morgan prior to April 23, 2018. In support of such argument, the Sheriff points to the fact that former Sheriff Seale contacted the OSBI on July 31, 2019 to initiate an investigation into several credible allegations – which he purportedly received after Morgan's resignation on July 27, 2018 – of the use of excessive and unnecessary force by Morgan on handcuffed and/or non-resisting citizens. Consequently, the Court finds genuine questions of material facts exist on the deliberate indifference prong of Mr. Tackett's informal custom or usage theory of liability. Summary judgment is inappropriate under these circumstances, and Mr. Tackett's informal custom or usage theory shall be submitted to the trier of fact for trial.

### B.   FAILURE TO TRAIN

The failure to train police officers "may serve as a basis for § 1983 liability only where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." Canton v. Harris, 489 U.S. 378, 388 (1989). Such circumstances are limited, however, as "[a] municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." Connick v. Thompson, 563 U.S. 51, 61 (2011) (*citing* Oklahoma City v. Tuttle, 471 U.S. 808, 822-233 (1984)). A failure to train theory requires proof of three elements: (1) the existence of a policy or custom involving deficient training; (2) the policy or

custom's causation of an injury, and (3) LCSO's adoption of a policy or custom with deliberate indifference. Lance v. Morris, 985 F.3d 787, 800 (10th Cir. 2021) (*citing* Waller v. City & Cty. of Denver, 932 F.3d 1277, 1283-84 (10th Cir. 2019)).

### 1.    Policy or Custom of Deficient Training

As to the first element, the Sheriff asserts that because Undersheriff Morgan was certified and trained by CLEET, LCSO cannot be held accountable based on deficient training. *See* Lopez v. LeMaster, 172 F.3d 756, 760 (10th Cir. 1999), *abrogated in part on other grounds*, Brown v. Flowers, 974 F.3d 1178, 1182 (10th Cir. 2020). To support his assertion that LCSO officers received "yearly training" in the use of force, the Sheriff relies heavily upon Morgan's CLEET training record and deposition testimony from LCSO officers C. Edwards and D. Edwards. [Doc. 121 at 11, ¶ 18]. However, the CLEET training record indicates that Morgan received a total of two trainings involving the use of force from January 2002 to October 2016. *See* [Doc. 121-17 at 1 ("08/06/2015 Police Use of Deadly Force"), 2 ("10/21/2011 Use of Force/Shooting Dec")]. And neither Deputy C. Edwards nor Lieutenant D. Edwards testified to receiving annual training on the use of force; rather, both officers testified to receiving an unspecified amount of training on the use of force from CLEET and the Oklahoma Sheriff's Academy. *See* [Doc. 121-5 at 3 (35:7-25); Doc. 121-6 at 3 (45:2-16), 6-7 (54:22-55:3)].

While compliance with CLEET certification requirements indicates some effort by LCSO to meet training obligations, the fact that Undersheriff Morgan ostensibly received two CLEET trainings (within a fourteen-year span) on the "use of deadly

force" and "use of force" does not immunize LCSO from liability for Morgan's alleged use of excessive force against Mr. Tackett. This is particularly true in light of the fact that LCSO's Training Policy authorizes acting sheriffs to coordinate and assign officer training based on "[t]he needs of the department[.]" [Doc. 121-16]. Although this fact is disputed, the summary judgment evidence suggests that Sheriff Seale had actual knowledge of at least four instances of unnecessary force used by Morgan and other LCSO officers prior to the incident at issue. *See e.g.,* [Doc. 127-5 at 7-8 (53:2-54:20), 9-10 (76:15-77:15), 29-32 (171:5-174:23), 36 (210:6-20); Doc. 127-6 at 2 (477:4-22); Doc. 127-8 at 4-5 (32:9-33:25)]. Based on the foregoing, the Court concludes the factfinder could reasonably infer that LCSO officers were deficiently trained in the use of excessive force during Sheriff Seale's tenure.

### 2.   Direct Causal Link

The record contains no indication that Sheriff Seale ever exercised his authority to assign officer training in the use of excessive force, despite a seemingly obvious need for such training. Accordingly, the Court finds that a reasonable factfinder could infer a direct causal link between Sheriff Seale's failure to provide any training concerning the use of force and Undersheriff Morgan's alleged use of excessive force against Mr. Tackett.

### 3.   Deliberate Indifference

As to the third element, Mr. Tackett must establish that LCSO's custom of deficient training was adopted with deliberate indifference. Lance, 985 F.3d at 800 (*citing* Waller, 932 F.3d at 1283-84). "'[D]eliberate indifference' is a stringent

standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his actions." Brown, 520 U.S. at 410.

> "Thus, when city policymakers are on actual or constructive notice that a particular omission in their training program causes city employees to violate citizens' constitutional rights, the city may be deemed deliberately indifferent if the policymakers choose to retain the program." Id. at 407. "The city's 'policy of inaction' in light of notice that its program will cause constitutional violations 'is the functional equivalent of a decision by the city itself to violate the Constitution.'" Canton, 489 U.S. at 395 (O'Connor, J., concurring in part and dissenting in part). "A less stringent standard of fault for a failure-to-train claim 'would result in *de facto respondeat superior* liability on municipalities . . .'" Id. at 392.

Connick, 563 U.S. at 61-62. Due to this stringent standard of fault, "[a] pattern of similar constitutional violations by untrained employees is 'ordinarily necessary' to demonstrate deliberate indifference for purposes of failure to train." Id. at 62.

In arguing that Mr. Tackett cannot show former Sheriff Seale was deliberately indifferent to Morgan's lack of training in the use of excessive force, the Sheriff wholly relies upon Seale's sworn declarations that (i) he "never personally witnessed" Morgan use excessive or unreasonable force against citizens, (ii) he heard "rumors" about Morgan using excessive and unnecessary force against citizens, but "nothing was ever substantiated," and (iii) he was "aware" of the civil rights lawsuit filed against Morgan by Mr. Osterhout, but "had no good reason" to disbelieve his officers' version of "disputed" events. [Doc. 121-4, ¶¶ 3-5]. Mr. Tackett responsively sets forth evidence indicating that, prior to April 23, 2018, Sheriff Seale was explicitly aware of multiple instances of excessive force by Morgan. *See* [Doc. 127 at 21-22]. Notwithstanding, genuine questions of material facts exist on the deliberate indifference prong of Mr. Tackett's failure to train theory of liability. Summary

20

judgment is inappropriate under these circumstances, and Mr. Tackett's failure to train theory shall be submitted to the trier of fact for trial.

### C. FAILURE TO SUPERVISE

To the extent Mr. Tackett claims there was a lack of supervision separate and apart from a lack of training, the analysis in determining the liability of the Sheriff is the same. *See* Schepp Fremont Cty., Wyo., 900 F.2d 1448, 1454 (10th Cir. 1990). Mr. Tackett asserts Sheriff Seale's supervision of LCSO officers was deficient because he was aware of multiple instances of excessive force used by LCSO officers prior to April 23, 2018, but failed to make it abundantly clear that the use of violent force on subdued detainees was unacceptable and would result in disciplinary action. In response, the Sheriff argues there is no evidence Rob Seale was aware of any pattern of excessive force which would have put him on notice of the need to more closely supervise Morgan. Consequently, genuine questions of material facts exist on each prong of Mr. Tackett's failure to supervise theory of liability. Summary judgment is inappropriate under these circumstances, and Mr. Tackett's failure to supervise theory shall be submitted to the trier of fact for trial.

### IV. CONCLUSION

WHEREFORE, the motion for summary judgment [Doc. 121] filed on behalf of defendant LeFlore County Sheriff is hereby **DENIED**.

IT IS SO ORDERED on this 5th day of February, 2025.

_____
JASON A. ROBERTSON
UNITED STATES MAGISTRATE JUDGE